**LAW OFFICE OF RICHARD JACOBS**
Richard Jacobs, Esq.
13512 Hatteras St.
Valley Glen, CA 91401
*Tel:* (818) 216-0663, *facsimile (*818)780-8696
richardjacobslaw@gmail.com

Attorneys for Plaintiff  THE MISSION LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE MISSION LLC, a California Limited Liability Company; | Case No.: |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiff, | |
| v. | |
| THE STATE OF CALIFORNIA; THE CITY OF SANTA BARBARA; and DOES 1-100, | |
| Defendants | |

## **INTRODUCTION**

1.     This lawsuit addresses a new law that targets one specific project on one specific parcel in the State of California.

2.     The new law only applies to one project in the entire state.

3.     As far as Plaintiff can tell, the new law only applies to a single parcel of land in the entire state.

4.     SB158 was promoted and ushered through by Sen. Monique Limón of Santa Barbara.

5.     Despite multiple reporters on the matter asking Sen. Monique Limón whether there are any other projects or parcels that SB158 would (or even could) apply to, the Senator avoided all questions on the subject.[1]

6.     The law is designed to block a low-income residential "Builder's Remedy" project in Santa Barbara that has already been vested by adding multiple layers of CEQA analysis to it that apply to no other project in the State.

7.     The Builder's Remedy is a California law created by and implemented by the Housing Accountability Act, the Housing Crisis Act (a.k.a. SB330), and the Permit Streamlining Act.

8.     Simply put, this new law is a violation of the following:

    a. The Equal Protection Clause in the U.S. Constitution;

    b. The Equal Protection Clause in the California Constitution;

    c. Non-discrimination laws;

---

[1] This lawsuit is not suing for Sen. Monique Limón's refusal to respond to questions regarding the law.

     d.  The bar on "special legislation" prohibiting laws that grating or removing rights to a single person or piece of land;

9.     As well, the law appears to be applied retroactively in violation of California statutes, California caselaw, and U.S. Supreme Court caselaw.  The CEQA analysis on this project began before the passage of SB158 and therefore to apply SB158's new CEQA standards would be to apply the law retroactively.

10.    While, in and of itself, this conduct is illegal, it has been complicated by a new development regarding Housing Elements in California from the case of *New Commune DTLA LLC v. City of Redondo Beach*, the opinion for which was just published on October 10, 2025.

11.    This development is so new that it occurred while this lawsuit was being prepared, thus necessitating a significant addition to this lawsuit.

12.    As discussed above, this is a Builder's Remedy project.

13.    Builder's Remedy projects are impacted significantly by whether the municipality where the project is located has a "compliant" Housing Element as part of its General Plan.

14.    The California Court of Appeals just ruled that another city's (Redondo Beach) Housing Element is non-compliant because of the use of zoning "overlays" to fulfill its Regional Housing Needs Allocations.

15.    The City of Santa Barbara used the same method of zoning "overlays" as Redondo Beach in its Housing Element.

16.    Therefore, this Court will also need to determine as part of this suit whether the new rubric set forth in *New Commune DTLA LLC v. City of Redondo Beach* makes the City of Santa Barbara's Housing Element noncompliant.

17.     This is because it will affect certain vesting rights as it applies to this project.

18.     Summarized, this lawsuit seeks the following:

    a. A determination that SB158 is illegal for the reasons set forth above;

    b. If SB158 is determined to be legal, a determination that the previous filing of the SB330 Preliminary Application on the project makes the new requirements of SB158 inapplicable to the project; and

    c. A determination that the City of Santa Barbara's Housing Element is non-compliant under the new rubric set forth in *New Commune DTLA LLC v. City of Redondo Beach*.

## **PARTIES**

19.     Plaintiff is a low-income real estate developer who owns the property located at 505 E. Los Olivos Street, Santa Barbara, CA.  Plaintiff has vested rights in a development project detailed below as to the property.

20.     Defendant the State of California is a state within the United States of America.

21.     Defendant City of Santa Barbara is a city incorporated in the State of California.

22.     The true names and capacities of defendants named as Doe 1 through Doe 100, inclusive, are presently unknown to Plaintiffs.  Plaintiffs will amend this complaint, setting forth the true names and capacities of these fictitious defendants when they are ascertained.  Plaintiffs are informed and believe, and on that basis alleges, that each of the fictitious

defendants has participated in the acts alleged in this complaint to have been done by the named defendants.

23.    Plaintiffs are informed and believe, and on that basis allege, that at all relevant times each of the defendants, whether named or fictitious, was the agent or employee of each of the other defendants, and in doing the things alleged to have been done in the Complaint, acted within the scope of such agency or employment, or ratified the acts of the other.

24.    Plaintiffs are informed and believe, and on that basis allege, that at all relevant times each of the defendants, whether named or fictitious, was the alter-ego of each of the other defendants, and in doing the things alleged to have been done in the Complaint, acted with a unity of interest such that the separate personalities of the corporate entity and the individual defendants do not in reality exist and honoring the separate entities would result in an inequitable result.

## VENUE

25.    Venue is proper in the Central District of California because the project that is targeted by SB158 is located in the City of Santa Barbara, which is in the jurisdiction of the Central District of California.

## BACKGROUND AND GENERAL ALLEGATIONS
### The Housing Crisis

26.    The Legislature has declared that "[t]he availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every Californian . . . is a priority of the highest order." (Gov. Code, § 65580, subd. (a).)

27.    California has a crisis-level housing shortage that stems from the failure of local governments to approve affordable housing to meet the

needs of all Californians. For decades, the Legislature has found that California has been suffering from "a severe shortage of affordable housing, especially for persons and families of low and moderate income" and that "there is an immediate need to encourage the development of new housing." (*Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 295, quoting Gov. Code, § 65913.)

28.    Recently, the Legislature stated plainly that "California has a housing supply and affordability crisis of historic proportions." (Gov. Code, § 65589.5, subd. (a)(2)(A).) "The consequences of failing to effectively and aggressively confront this crisis are hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives." (*Ibid.*)

## Housing Elements and the Planning Process

29.    State law requires that all local governments adequately plan to meet the housing needs of everyone in the community, at all economic levels. To meet this requirement, every city and county must adopt and periodically update a housing element as part of its general plan. (See Gov. Code, §§ 65302, subd. (c), 65580, et seq.) The law mandating this adoption and periodic update is known as the "Housing Element Law." (Id., § 65580, et seq.)

30.    California's Housing Element Law requires local governments to adopt plans and regulatory systems that provide opportunities for, and do not unduly constrain, housing development, especially for a locality's lower-income households and workforce. As a result, housing policy in

California rests largely on the effective implementation of the housing element contained in the local general plan.

31.    The housing element is a roadmap for housing development in a given community. The housing element must identify and analyze existing and projected housing needs, and must include "a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing." (Gov. Code, § 65583.) The housing element must also "identify adequate sites for housing" and "make adequate provision for the existing and projected needs of all economic segments of the community." (*Ibid.*) Each housing element is also subject to review by the California Department of Housing and Community Development (hereinafter "HCD".)

32.    A local jurisdiction's housing element must be frequently updated to ensure compliance with California's Housing Element Law. (Gov. Code, § 65588.) Jurisdictions must update their housing elements every five or eight years. (See *id.*, subd. (e)(3).) Each five- or eight-year cycle is known as a "planning period." (See *id.*, subd. (f)(1).)

33.    The process of updating a housing element begins with HCD's determination of a Regional Housing Need Allocation ("RHNA") for the region for a given planning period. (Gov. Code, § 65584, subd. (a)(1).) The RHNA sets goals for housing affordable to various income levels. To arrive at the RHNA, HCD starts with demographic population information from the California Department of Finance and uses a formula to calculate a figure for each region's planning body, known as a "council of governments" ("COG"). Each COG (in this case, the Southern California Association of Governments) also uses its own demographic figures to calculate the regional housing need. Each COG coordinates with HCD to arrive at a final

figure, taking into account factors not captured in the calculations. This final figure is the RHNA. (See *id.*, § 65584.01.) Once the RHNA is set, the COG is responsible for allocating the housing need among all of the cities and counties within that region. (Gov. Code, § 65584, subd. (b).) Each local government must then prepare a housing element that identifies adequate sites to accommodate that jurisdiction's fair share of the RHNA at each income level. (*Id.*, §§ 65583, 65583.2.))

34.    Each local government must submit its draft housing element to HCD before adoption. (Gov. Code, § 65585, subd. (b)(1).) HCD must review the draft element and issue findings as to whether the draft substantially complies with the Housing Element Law. (*Id.*, subds. (b)(3), (d).) After adopting the final housing element, the local government must again submit the element to HCD, and HCD must again review and report its findings to the local government. (*Id.*, subds. (g), (h).)

**The Housing Accountability Act and the "Builder's Remedy"**

35.    The Legislature originally enacted the Housing Accountability Act ("HAA") in 1982 in an effort to compel local governments to approve more housing, and has repeatedly amended the law to increase its effectiveness. (Gov. Code, § 65589.5, subd. (a); *Ruegg*, supra, 63 Cal.App.5th at pp. 295–297.) In 1990, the Legislature made the HAA expressly applicable to charter cities. (*California Renters Legal Advoc. & Educ. Fund v. City of San Mateo* (2021) 68 Cal. App. 5th 820, 835.)

36.    In general, the HAA provides that when a proposed housing development complies with applicable general plan, zoning, and development policies, the local agency may disapprove the project (or approve it on condition that it be developed at lower density) only if the local agency finds that the project would have a specific, adverse, and

unavoidable impact on public health or safety. (Gov. Code, § 65589.5, subd. (j)(1).)

37.    Specifically, a local agency must approve any housing development project that complies with locally adopted objective standards, unless it can make two written findings based on a preponderance of evidence in the record. (Gov. Code, § 65589.5, subd. (j)(1).) First, the proposed development must have a significant and adverse impact on public health or safety. (*Id.*, subd. (j)(1)(A).) Second, disapproval must be the only means of mitigating or avoiding the impact. (*Id.*, subd. (j)(1)(B).) These findings must be project-specific, and the public health or safety impact must constitute "a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete." (*Id.*, subd. (j)(1)(A).)

38.    If the local agency considers a proposed housing development project to be inconsistent, not in compliance, or not in conformity with an applicable objective standard, it must provide the project applicant with "written documentation" that identifies the applicable provision or provisions, along with "an explanation of the reason or reasons it considers the housing development to be inconsistent, not in compliance, or not in conformity" with those standards. This explanation is due within 30 days an application is deemed complete for a housing development with 150 or fewer housing units, or within 60 days an application is deemed complete for a housing development with more than 150 housing units. (*Id.*, subd. (j)(2)(A).) If this documentation is not provided by the applicable deadline, the application is deemed consistent with the applicable standards. (*Id.*, subd. (j)(2)(B).)

39.    The foregoing provisions of subdivision (j) apply to all housing development projects. Where a proposed housing development includes affordable housing, a local agency's discretion to deny the project is even further constrained. (*Id.*, subd. (d).) An affordable housing project may only be denied under five specific and narrow circumstances.

40.    The 1990 HAA amendments modified subdivision (d) to provide that cities and counties could only deny, or apply conditions that make infeasible, a housing development project for very low-, low- or moderate-income households or an emergency shelter if they are able to make one of five specific findings. (Gov. Code, § 65589.5, subd. (d).) Those five findings, paraphrased, are:

a.  The city or county has met or exceeded its RHNA for the proposed income categories in the development.

b.  The housing development or emergency shelter would have a specific adverse impact on public health and safety, and there is no way to mitigate or avoid the impact without making the development unaffordable. Such an impact must be based on objective, written public health or safety standards in place when the application was deemed complete.

c.  The denial or imposition of conditions is required to comply with state or federal law, and there is no feasible method to comply without making the development unaffordable.

d.  The project is proposed on land zoned for agriculture or resource preservation that is surrounded on at least two sides by land being used for agriculture or resource

preservation, or there are not adequate water or sewage facilities to serve the project.

    e.   The project is inconsistent with both the zoning ordinance and the land use designation as specified in any general plan element, and the jurisdiction has adopted a substantially compliant housing element.

41.   The last of these five findings, subdivision (d)(5), is the source of the so-called Builder's Remedy. By negative implication, if a locality has not adopted a housing element in substantial compliance with state law, it cannot deny a project that includes affordable housing on grounds that it does not comply with a zoning or land-use designation.

### The Housing Crisis Act

42.   The Housing Crisis Act of 2019 ("HCA") prohibits a local government from "enact[ing] a development policy, standard, or condition" that would have the effect of "[c]hanging the general plan land use designation, specific plan land use designation, or zoning of a parcel or parcels of property to a less intensive use or reducing the intensity of land use within an existing general plan land use designation, specific plan land use designation, or zoning district in effect at the time of the proposed change, below what was allowed under the land use designation or zoning ordinances … in effect on January 1, 2018." (Gov. Code, § 66300, subd. (b)(1)(A).) The statute defines "reducing the intensity of land use" to include "any other action that would individually or cumulatively reduce the site's residential development capacity." (*Ibid.*)

43.   The HCA also prohibits a local government from "[i]mposing a moratorium or similar restriction or limitation on housing development … within all or a portion of the jurisdiction … other than to specifically protect

against an imminent threat to the health and safety of persons residing in, or within the immediate vicinity of, the area subject to the moratorium….” (Gov. Code, § 66300, subd. (b)(1)(B)(i).)

44.    In addition, a local agency shall not enforce such “a moratorium or other similar restriction on or limitation of housing development until it has submitted the ordinance to, and received approval from, [HCD].” (Gov. Code, § 66300, subd. (b)(1)(B)(ii).) If HCD denies approval, “that ordinance shall be deemed void.” (*Ibid.*)

### The SB330 Preliminary Application

45.    As well, the Housing Crisis Act created the SB330 Preliminary Application process.

46.    An applicant for a housing development project may submit a “preliminary application” to the municipality by providing answers to 17 statutory questions.  (Gov. Code, § 65941.1, subd. (a)(1)-(17).)

47.    Once an SB330 Preliminary Application is submitted, subject to certain limitations, the laws governing the project are “locked in” and newly adopted laws do not apply to the project.  (Gov. Code, § 65589.5, subd. (k)(1)(A)(i)(III)(ia).)

48.    Plaintiff submitted its SB330 Preliminary Application, which the City of Santa Barbara acknowledged acceptance of on January 29, 2024.

### Santa Barbara’s Failure To Pass A Conforming Housing Element To Its General Plan

49.    HCD maintains a database of which municipalities within the State of California have been approved as compliant.  It also tracks housing elements currently under review by HCD.  The database is located online at https://www.hcd.ca.gov/planning-and-community-

development/housing-open-data-tools/housing-element-review-and-
compliance-report

50.    During the period Plaintiff submitted its SB330 Builder's
Remedy Preliminary Application, according to the HCD's Housing Element
Compliance Report the City of Santa Barbara was "Out of Compliance".

51.    As such, at the time it was required to allow Builder's Remedy
applications and process those applications subject to the laws and
procedures set forth above and in the Code.

### SB158 (2025)

52.    SB158 was signed into law and chaptered by the California
Secretary of State on October 11, 2025.

53.    It is labeled as a "Budget Act", but it is in fact an attack on a
single Builder's Remedy project located in Santa Barbara.  This is Plaintiff's
project.

54.    The key provision of SB158 was to add Public Resources Code
Section 21080.73 to add new layers of CEQA review to a single project
with a law that only affects a single parcel in the State of California.  The
new code section provides:

> Notwithstanding any other law, a housing development project,
> as defined in paragraph (2) of subdivision (h) of Section
> 65589.5 of the Government Code, that meets the following
> criteria shall be considered a discretionary project, as that term
> is used in subdivision (a) of Section 21080, and shall not be
> exempt from this division:
>
> (a) The project is located in a city with a population of
> more than 85,000 but less than 95,000, as determined by
> the 2020 Census.
>
> (b) The project is located in a county with a population of
> more than 440,000 but less than 455,000, as determined
> by the 2020 Census.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 13

(c) A portion of the parcel where the project is located is identified on a United States Fish and Wildlife Service map as freshwater forested or shrub wetland.

(d) A portion of the parcel where the project is located is within a regulatory floodway as determined by the Federal Emergency Management Agency in any official maps published by the Federal Emergency Management Agency.

(e) The project is located on a parcel adjacent to a California historical landmark on the California Register of Historic Places.

55.    While ostensibly drafted to apply to any housing development project that meets the specified criteria, the actual effect is to block a single project on a single parcel in the state of California.

56.    Going through the 5 point analysis within Public Resources Code Section 21080.73:

(a) The project is located in a city with a population of more than 85,000 but less than 95,000, as determined by the 2020 Census.

   i. There is only one city in the State of California with a population between 85,000 and 95,000 as determined by the 2020 Census:  The City of Santa Barbara.

(b) The project is located in a county with a population of more than 440,000 but less than 455,000, as determined by the 2020 Census.

   i. There is only one county in the State of California with a population between 440,000 and 455,000 as determined by the 2020 Census:  The County of Santa Barbara.

(c) A portion of the parcel where the project is located is identified on a United States Fish and Wildlife Service map as freshwater forested or shrub wetland.

(d) A portion of the parcel where the project is located is within a regulatory floodway as determined by the Federal Emergency Management Agency in any official maps published by the Federal Emergency Management Agency.

(e) The project is located on a parcel adjacent to a California historical landmark on the California Register of Historic Places.

  i. There is only one housing development located in the City of Santa Barbara and County of Santa Barbara that meets criteria (c), (d), and (e).

  ii. There is only one parcel located in the City of Santa Barbara and County of Santa Barbara that meets criteria (c), (d), and (e).

57.    Put simply, this bill is designed to specifically target one project and one parcel of land in the entire state.

58.    Notably, multiple news sources have confirmed that this bill is designed to stymie only this project on this parcel of land.  These include:

a. Budget carveout appears to stymie apartment construction in powerful Democrat's district – CalMatters - https://calmatters.org/politics/2025/09/budget-bill-santa-barbara-housing-project/

b. A powerful California lawmaker wants to overturn the 'Holy Grail' of housing reform — just for one project – San Francisco Chronicle - https://www.sfchronicle.com/opinion/emilyhoeven/article/california-housing-nimby-ceqa-limon-21039832.php

c. Senators narrowly pass imperiled CEQA exemption for SoCal apartment – Politico - https://subscriber.politicopro.com/article/2025/09/lawmakers-balk-at-paring-back-ceqa-exemptions-for-socal-apartment-complex-00562791

### *New Commune DTLA LLC v. City of Redondo Beach.*

59.    On October 10, 2025, the California Court of Appeals published its opinion in the matter of *New Commune DTLA LLC v. City of Redondo*

*Beach* (10/10/2025) B336042.  There is no citation yet.  Therefore, Plaintiff is attaching a courtesy copy of the published opinion to this complaint as **Exhibit 1**.

60.    In *New Commune*, a developer challenged the City of Redondo Beach's Housing Element because of its use of a zoning overlay to create specific sites that were zoned for commercial and industrial to allow for multifamily housing as an additional potential use.

61.    The *New Commune* Court determined that the creation of the overlay allowing for multi-family residential on sites that were otherwise zoned differently does not comply with Government Code Section 65583.2(h)(2).

62.    This was for multiple reasons, but summarized, it was because other uses were by right and therefore the creation of small areas that had overlay rights for multi-family residential conflicted with the minimum density requirements and that development is still allowed on the sites for uses other than multi-family residential.

63.    The California Department of Housing and Community Development had actually approved the Housing Element, but the Court noted that the HCD approval did not cure the statutory violations.

64.    The Court noted that although there was a rebuttable presumption of validity after HCD's approval under Government Code Section 65589.3, that the presumption was rebutted.

65.    Similarly here, the City of Santa Barbara used overlay zones to ostensibly fulfill its RHNA requirements.

66.    Under the new rubric of *New Commune*, this makes the Housing Element non-compliant.

### *The Project At Issue*

67.    The project at issue here is a Builder's Remedy project located at 505 E. Los Olivos Street, Santa Barbara, CA.  [The "Property."]

68.    Plaintiff submitted its SB330 Preliminary Application, which the City of Santa Barbara acknowledged acceptance of on January 29, 2024.

69.    At the time of submission of the SB330 Preliminary Application, the City of Santa Barbara's Housing Element was non-compliant.[2]

70.    The City of Santa Barbara initially refused to comply with SB330 and demanded additional information beyond the 17 statutory questions set forth in Government Code Section 65941.1, subd. (a)(1)-(17), but eventually agreed to come into compliance with the law.

71.    Plaintiff submitted its Planning Application for the project.

72.    This resulted in a significant period of back and forth with the City (once again) violating the California Housing Accountability Act, Housing Crisis Act, and Permit Streamlining Act in an effort to block the project.

73.    After various legal measures were taken, the City eventually came into compliance and deemed the project complete.

74.    After the project was deemed complete by the City, Sen. Monique Limón pushed SB158 through the Legislature targeting the project by adding CEQA requirements to it that are not required for any other similar project and that only apply to a single parcel of property in the entire State of California.

---

[2] The non-compliance at the time of submission is not a disputed issue as it relates to this case.  The current compliance is a disputed issue.

75.    Plaintiff should clarify:  This lawsuit is not suing for the protected activities listed above; these are provided only for context.  The lawsuit only seeks to invalidate SB158, address whether the SB330 Preliminary Application vested the CEQA regulations as to the Project such that SB158 would not apply, and determine whether the City of Santa Barbara's Housing Element is valid.

76.    The project anticipates having 270 units, including 54 low-income units in the City of Santa Barbara.

77.    Notably, Santa Barbara is facing such a housing shortage for low-income residents that the "low-income" definition for a family of four is still six-figures.

78.    The City of Santa Barbara is required under its Housing Element to create 8,001 new housing units by 2031.

79.    The project will help by providing almost 4% of those required units.

80.    It will also help with the low-income allocation by providing 20% of the units as low-income units.

81.    It has been designed by local architects to conform to the local area while still maximizing housing for the City.

82.    Nonetheless, the City wishes to block the project.

83.    While there are numerous examples, it can be summarized by the (now former) Santa Barbara Mayor Sheila Lodge who described bringing in the multi-family residential project with its low-income units as a "monstrosity."

84.    The City has made no secret of the fact that it will do anything it can to block the project.

## **FIRST CAUSE OF ACTION**

### **(Invalidity Of SB158 – U.S. Constitution)**

85.    Plaintiff incorporates each of the allegations set forth in the prior paragraphs.

86.    As set forth above, SB158 targets a single project in the State of California.

87.    SB158 also only applies to a single parcel of land in the State of California.

88.    As such, it violates the U.S. Constitution.

89.    These violations include, but are not limited to:

    a. The Equal Protection Clause of the 14th Amendment to the Constitution

    b. The Due Process Clause of the 14th Amendment to the Constitution

    c. Prohibitions on Special Legislation [caselaw interpreting the Constitution]

    d. The prohibition on *ex post facto* laws in Article I, Sections 9 and 10

90.    Any of these violations makes SB158 invalid.

## **SECOND CAUSE OF ACTION**

### **(Invalidity Of SB158 – California Constitution)**

91.    Plaintiff incorporates each of the allegations set forth in the prior paragraphs.

92.    As set forth above, SB158 targets a single project in the State of California.

93.    SB158 also only applies to a single parcel of land in the State of California.

94.     As such, it violates the California Constitution.

95.     These violations include, but are not limited to:

    a.  The Equal Protection Clause of Article I, Section 31 of the California Constitution

    b.  The Due Process Clause of Article I, Section 7 of the California Constitution

    c.  Prohibitions on Special Legislation of Article IV, Section 16 of the California Constitution

96.     Any of these violations makes SB158 invalid.

### THIRD CAUSE OF ACTION

### (Declaratory Relief – Vested Rights)

97.     Plaintiff incorporates each of the allegations set forth in the prior paragraphs.

98.     If the Court determines that SB158 is invalid, this cause of action may be moot depending on the specifics of the ruling.

99.     If the Court determines that SB158 is valid, or the specifics of the ruling preserve parts of SB158 that affect this project, Plaintiff respectfully requests a determination that SB158 does not work retroactively on Plaintiff's project.

100.   Plaintiff began its project with the submission of the SB330 Preliminary Application on January 29, 2024.

101.   Plaintiff's planning application was deemed "complete" as of July 3, 2025.

102.   Under California Public Resources Code 21080.2 and the State of California's CEQA Guidelines, once a private project is accepted as complete the lead agency must start its CEQA review to determine whether

CEQA applies, and whether the project will require an Environmental Impact Report, Mitigated Negative Declaration, etc.

103.   Therefore, the CEQA process for the City of Santa Barbara began on this project on July 3, 2025.

104.   In California, statutes are presumed to operate prospectively. (*See. e.g. Quarry v. Doe I* (2012) 53 Cal.4th 945, 955.)

105.   Under both California Civil Code § 3 and California caselaw (*see e.g. In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1439), no new statutes passed are retroactive unless the statute expressly states that it is retroactive.[3]

106.   This has also been the policy of the U.S. Supreme Court as set forth in *Landgraf v. USI Film Products* (1994) 511 U.S. 244, where the Court stated "The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact."  (*Id.* at 270.)

107.   SB158 does not state that it is to be applied retroactively.

108.   Therefore, Plaintiff respectfully states that if the Court finds SB158 to be valid or partially valid in such a way that its provisions still may impact the CEQA analysis of this project that SB158 does not apply retroactively to this project retroactively and the CEQA analysis should proceed based upon the status of the laws of California on July 3, 2025.

---

[3] Plaintiff acknowledges that there is an exception to this rule as it relates to new statutes that "clarify existing law" as opposed to new law.  That is not the situation with SB158.

## FOURTH CAUSE OF ACTION

### (Invalidation Of Housing Element Under
### *New Commune DTLA LLC v. City of Redondo Beach*)

109.  Plaintiff incorporates each of the allegations set forth in the prior paragraphs.

110.  Plaintiff respectfully alleges that the City of Santa Barbara's new Housing Element violates the test created in *New Commune DTLA LLC v. City of Redondo Beach*.

111.  Specifically, the City of Redondo used an "overlay" system that allows residential development on commercial and industrial parcels if the commercial or industrial parcel may still "by right" be developed without any housing.

112.  The Court found that because the parcels could be developed "by right" without housing, they could not satisfy the minimum density and residential use requirements of California Government Code Section 65583.2(h)(2).

113.  The City of Santa Barbara's new Housing Element seeks to satisfy its minimum density and residential use requirements set forth in California Government Code Section 65583.2(h)(2) by allowing multi-family residential development in various non-residential zones including, but not limited to:  R-O [Restricted Office Zone], C-O [Medical Office Zone], C-P [Restricted Commercial Zone], C-L [Limited Commercial Zone], C-1 [Limited Commercial Zone], C-2 [Commercial Zone], C-M [Commercial Manufacturing Zone] and M-1 [Light Manufacturing Zone][4].

---

[4] The M-1 [Light Manufacturing Zone] features an odd dichotomy that is inherently contradictory as to

114.  As such, under the new test set forth in *New Commune*, the City of Santa Barbara's Housing Element is invalid.

### PRAYER

WHEREFORE, Plaintiff prays for judgment as follows:

1.  For a determination that SB158 is invalid in whole or in part;

2.  For a determination that if SB158 is valid in whole or in part that it does not apply retroactively to the project;

3.  For a determination that the City of Santa Barbara's Housing Element is invalid;

4.  For declaratory relief;

5.  For costs and fees of the suit;

6.  For general and actual damages;

7.  For injunctive relief;

8.  For any other, further, or different relief as the Court may deem proper.

Dated this 24th day of October, 2025

_____
Richard B. Jacobs
Attorney for Plaintiff

_____

how it addresses multi-family residential housing.  The M-1 zone allows the uses set forth in R-4 [Hotel, Motel, Multiple Residence Zone] "except residential" uses, but also allows R-O [Restricted Office Zone] without limitation.  The issue is that R-O allows for "any use permitted in the R-3 Limited Multiple-family Residence Zone" with certain exceptions.  Therefore, the M-1 [Light Manufacturing Zone] simultaneously allows multi-family residential housing and prohibits it.